**RECEIVED**

MAY 1 9 2014

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | |
|---|---|
| MICHEL G. MORENO, ET AL. | CIVIL ACTION NO. 6:12CV2920 |
| VERSUS | JUDGE DOHERTY |
| U.S.A. | MAGISTRATE JUDGE HANNA |

## MEMORANDUM RULING

Currently pending before the Court is a motion for partial summary judgment [Doc. 21] filed by plaintiffs, Michel B. Moreno and Tiffany C. Moreno, and a motion for partial summary judgment [Doc. 22] filed by defendant, the United States of America.  For the following reasons, the motion filed by plaintiffs [Doc. 21] is GRANTED IN PART, and the motion filed by defendant [Doc. 22] is DENIED.

### Factual Background

This suit was brought by plaintiffs, Michel and Tiffany Moreno, to recover a refund for the alleged overpayment of federal income taxes for the year 2005.[1]  The dispute centers around a $4,775,138.00 loss claimed by plaintiff, which he alleges arose out of the acquisition and leasing of a Learjet aircraft during the year 2005.[2]  The aircraft was owned and operated through Aerodynamic,

---

[1]Mr. Moreno's wife, Tiffany C. Moreno, is a party to this matter only because the plaintiffs filed a joint tax return in 2005.  Therefore, references to "plaintiff" are to Mr. Moreno.

[2]The loss primarily arises from a deduction for depreciation of the aircraft. [Doc. 22-2, p. 2, ¶ 4; Doc. 29-1, p. 1, ¶ 4]

LLC, a limited liability company of which Mr. Moreno was the sole owner in 2005.[3] [Doc. 21-2, p. 5; Doc. 22-1, p. 6]   Aerodynamic acquired the aircraft on September 30, 2005, for the sum of $7,929,133.00. [Doc. 21-2, p. 6; Doc. 22-1, p. 6] The purchase was financed by a loan from General Electric Capital Corporation ("GE") to Aerodynamic in the amount of the purchase price. [Doc. 21-2, p.6; Doc. 22-1, pp. 6-7] The loan was secured by a security interest granted to GE in the Aircraft, the corporate guaranty of Dynamic Industries, Inc. ("Dynamic")[4], and an individual personal guaranty by Michel Moreno. [Doc. 21-2, p. 7; Doc. 22-1, p.7] Once acquired, Aerodynamic leased the aircraft to various lessees throughout the remainder of 2005.

By way of this suit, plaintiffs seek to recover federal income taxes of $667,299.00, plus interest thereon, for the tax year 2005 on the grounds that they are entitled to deduct the entire Aerodynamic loss in 2005. [Doc. 22-2, p.12, ¶ 28; Doc. 29-1, p.4, ¶ 28] By way of their respective motions, plaintiffs seek a ruling they were "at risk within the meaning of 26 U.S.C. § 465 with respect to the aircraft leasing activity in which Aerodynamic, LLC engaged during 2005," and "[t]hat the leasing activity of Aerodynamic, LLC in 2005 was not a rental activity by reason of the exception set forth in 26 C.F.R. § 1.469-1T(e)(3)(ii)(A) because the average period of customer use of Aerodynamic's aircraft was less than 7 days" [Doc. 21, p.1]; defendant seeks a ruling that plaintiffs were not at risk pursuant to 26 U.S.C. § 465 with respect to the aircraft leasing activity, and that the aircraft leasing activity constituted a rental activity, subject to the passive activity loss rules found

---

[3]Aerodynamic was a disregarded entity for federal income tax purposes, and Aerodynamic's operations were reported on a Schedule C to the plaintiffs' personal income tax return in 2005. [Doc. 21-2, p.5; Doc. 22-1, pp. 5, 6]

[4]According to plaintiff, "In 2005, Michel B. Moreno owned 98% of Moreno Energy, Inc. which owned 100% of Dynamic Industries Inc. ('Dynamic')." [Doc. 21-2, p.6]

at 26 U.S.C. § 469.

<h2 style="text-align:center">Summary Judgment Standard</h2>

"A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

*Id.* at § (c)(1).

If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:

> (1) give an opportunity to properly support or address the fact;

> (2) consider the fact undisputed for purposes of the motion;

> (3) grant summary judgment if the motion and supporting materials--including the facts considered undisputed--show that the movant is entitled to it; or

> (4) issue any other appropriate order.

*Id.* at § (e).

As summarized by the Fifth Circuit in *Lindsey v. Sears Roebuck and Co.*, 16 F.3d 616, 618

(5th Cir. 1994):

> When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). However, where the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial. *Id.* at 322; *see also, Moody v. Jefferson Parish School Board*, 2 F.3d 604, 606 (5th Cir.1993); *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 190 (5th Cir.1991). Only when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" is a full trial on the merits warranted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The Supreme Court has instructed:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Where no such showing is made, "[t]he moving party is entitled to a judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."

*Lujan v. National Wildlife Federation*, 497 U.S. 871, 884 (1990)(quoting *Celotex Corp. v. Catrett*,

477 U.S. 317, 322-23 (1986)).  The Court later states:

> In ruling upon a Rule 56 motion, "a District Court must resolve any factual issues of controversy in favor of the non-moving party" only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied. That is a world apart from "assuming" that general averments embrace the "specific facts" needed to sustain the complaint . . . . Rather, the purpose of Rule 56 is to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues.

*Id.* at 888-89 (1990)(internal quotations and citations omitted).  The Fifth Circuit has further

elaborated:

[The parties'] burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence. We resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts. We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts. ...[S]ummary judgment is appropriate in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.

*Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)(citations and internal quotations omitted).

Finally, in evaluating evidence to determine whether a factual dispute exists, "credibility determinations are not part of the summary judgment analysis." *Id.* To the contrary, in reviewing all the evidence, the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party, as well as that evidence supporting the moving party that is uncontradicted and unimpeached. *Roberts v. Cardinal Servs.*, 266 F.3d 368, 373 (5th Cir. 2001).

**Applicable Law and Analysis**

**I.     Whether plaintiff was "at risk" with respect to Aerodynamic, LLC's leasing activity**

The Internal Revenue Code provides, generally, that a taxpayer may take a deduction from leasing depreciable property to the extent that he is "at risk" in the leasing activity.  26 U.S.C. § 465(a)(1), (c)(1)(C).  Under the code, a taxpayer is considered "at risk for an activity with respect to . . . amounts borrowed with respect to such activity," provided the taxpayer "is personally liable for the repayment of such amounts." *Id.* at § 465(b)(1)(B), (b)(2)(A).[5]  However, "a taxpayer shall

---

[5] 26 U.S.C. § 465 reads in pertinent part as follows:

**(a)     In general.**-- In the case of--

(A) an individual . . .

engaged in an activity to which this section applies, any loss from such activity
for the taxable year shall be allowed only to the extent of the aggregate amount
with respect to which the taxpayer is at risk (within the meaning of subsection
(b)) for such activity at the close of the taxable year.

. . . .

(b)     **Amounts considered at risk.--**

(1)     **In general.--** For purposes of this section, a taxpayer shall be considered
at risk for an activity with respect to amounts including--

. . .

(B)     amounts borrowed with respect to such activity (as determined
under paragraph (2)).

(2)     **Borrowed amounts.--**For purposes of this section, a taxpayer shall be
considered at risk with respect to amounts borrowed for use in an
activity to the extent that he--

(A)     is personally liable for the repayment of such amounts . . . .

. . . .

(4)     **Exception.--**Notwithstanding any other provision of this section, a
taxpayer shall not be considered at risk with respect to amounts
protected against loss through nonrecourse financing, guarantees, stop
loss agreements, or other similar arrangements.

. . . .

(c)     **Activities to which section applies. --**

(1)     **Types of activities.** -- This section applies to any taxpayer engaged in
the activity of --

. . .

(C)     leasing any section 1245 property (as defined in section
1245(a)(3)) . . . .

26 U.S.C. § 465 (emphasis in original). Losses disallowed by this provision may be carried forward and

not be considered at risk with respect to amounts protected against loss through nonrecourse

financing, guarantees, stop loss agreements, or other similar arrangements." *Id.* at § 465(b)(4).

In this matter, plaintiff argues he was "at risk for the Aerodynamic activity of leasing the

Aircraft, as Michel Moreno personally guaranteed the repayment of the loan from GE." [Doc. 21-2,

p.11] "If the loan defaulted and the sale of the Aircraft was not sufficient to pay off the indebtedness,

GE could pursue Mr. Moreno, Dynamic or both." [Id. at 13]   The government agrees Moreno

personally guaranteed the repayment of the GE loan to Aerodynamic, and thus satisfies section

465(b)(2)(A) ("a taxpayer shall be considered at risk with respect to amounts borrowed . . . to the

extent that he . . . is personally liable for the repayment of such amounts"). [Doc. 22-1, p. 7; Doc.

28, p. 12] However, the government argues "the substance and economic realities of the transaction"

protected Moreno from ever being required to satisfy his obligation on Aerodynamic's note [Doc.

28, p.21], and therefore, the transaction falls within the exception from at risk treatment provided

by section § 465(b)(4) ("a taxpayer shall not be considered at risk with respect to amounts protected

against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar

arrangements").   The government does not argue Moreno is "protected against loss [arising out of

his personal guaranty] through nonrecourse financing, guarantees, [or] stop loss agreements." 26

U.S.C. § 465 (b)(4).   Thus, in order for the exception provided in section 465(b)(4) to apply, the

Court must determine whether Moreno's personal guarantee of the Aerodynamic loan was "protected

against loss through . . . other similar arrangements." *Id.*

---

deducted as losses in succeeding taxable years if the at risk rules become satisfied.  26 U.S.C. §
465(a)(2).

The statute does not define or explain the phrase "other similar arrangements." The Second, Eighth, Ninth and Eleventh Circuits apply an "economic realities" test to determine whether a borrowed amount is protected against loss under § 465(b)(4). *See e.g. Waters v. Commissioner*, 978 F.2d 1310, 1316 (2nd Cir. 1992); *Moser v. Commissioner*, 914 F.2d 1040, 1048-49 (8th Cir. 1990); *American Principals Leasing Corp. v. United States*, 904 F.2d 477, 483 (9th Cir. 1990); *Young v. Commissioner*, 926 F.2d 1083, 1089 (11th Cir. 1991). The Sixth Circuit applies a "payor of last resort" test to determine whether a borrowed amount is protected against loss. *See e.g. Emershaw v. Commissioner*, 949 F.2d 841, 845 (6th Cir. 1991). The Fifth Circuit has not addressed the applicable standard.

The "economic realities" test was originally set forth by the Ninth Circuit in *American Principals Leasing Corporation, supra*. According to that test, whether a taxpayer is personally liable for repayment of borrowed amounts under § 465(b)(2) is determined by analyzing whether the taxpayer is ultimately liable for repayment of the borrowed amounts "in a worst-case scenario." *Id.* at 482. However, "whether the taxpayer has engaged in a loss-limiting arrangement prohibited by subsection 465(b)(4)" (and thus falls within the exception to "at risk" treatment) is determined by whether "a transaction is structured – by whatever method – to remove any realistic possibility that the taxpayer will suffer an economic loss if the transaction turns out to be unprofitable." *Id.* at 483. Under the economic realities test, "[a] theoretical possibility that the taxpayer will suffer an economic loss is insufficient to avoid the applicability of this subsection." *Id.* By contrast, the Sixth Circuit's "payor of last resort" test asks whether, under *both* sections 465(b)(2) and (b)(4), "in a worst case scenario, the individual taxpayer will suffer any personal, out-of-pocket expenses." *Pledger v. U.S.*, 236 F.3d 315, 319 (6th cir. 2000) (citing *Emershaw v. Commissioner*, 949 F.2d 841,

848-51(6th Cir. 1991)).[6]   According to the United States Tax Court, "whichever standard is used,

---

[6]The disagreement between the 6th and 9th Circuits appears to stem primarily from those courts interpretations of the legislative history of § 465(b)(4), which was drafted to curb abuses by tax shelters. S. REP. 94-938, 49, 1976 U.S.C.C.A.N. 3438, 3482; *see also Nicholson v. Commissioner*, 60 F.3d 1020, 1026 (3rd Cir. 1995) (Alito, J.). The pertinent portions of the legislative history read as follows:

>    For purposes of this provision, a taxpayer is generally to be considered "at risk" with respect to an activity to the extent of his cash and the adjusted basis of other property contributed to the activity, as well as any amounts borrowed for use in the activity with respect to which the taxpayer has personal liability for payment from his personal assets. . . .

>            . . .

>    Also, under these rules, a taxpayer's capital is not "at risk" in the business, even as to the equity capital which he has contributed to the extent he is protected against economic loss of all or part of such capital by reason of an agreement or arrangement for compensation or reimbursement to him of any loss which he may suffer. Under this concept, an investor is not "at risk" if he arranges to receive insurance or other compensation for an economic loss after the loss is sustained, or if he is entitled to reimbursement for part or all of any loss by reason of a binding agreement between himself and another person.

>    In livestock feeding operations, for example, some commercial feedlots have offered to reimburse investors against any loss sustained on sales of the fed livestock above a stated dollar amount per head. Under such "stop loss" orders, the investor is to be considered "at risk" (for purposes of this provision) only to the extent of the portion of his capital against which he is not entitled to reimbursement. Similarly, in some livestock breeding investments carried on through a limited partnership, the partnership agrees with a limited partner that, at the partner's election, it will repurchase his partnership interest at a stated minimum dollar amount (usually less than the investor's original capital contribution). In situations of this kind, the partner is to be considered 'at risk' only to the extent of the portion of the amount otherwise at risk over and above the guaranteed repurchase price.

>    Similarly, if a taxpayer is personally liable on a mortgage but he separately obtains insurance to compensate him for any payments which he must actually make under such personal liability, the taxpayer is at risk only to the extent of the uninsured portion of the personal liability to which he is exposed. [FN 364] The taxpayer will be able to include in the amount which he has at risk any amount of premium which he had paid from his personal assets with respect to the insurance. However, a taxpayer who obtains casualty insurance or insurance protecting himself against tort liability will not be considered 'at risk' solely because of such insurance protection.

>    [FN 364] For purposes of this rule, it will be assumed that a loss-protection guarantee, repurchase agreement or insurance policy will be fully honored and

the ultimate, the ultimate decision rests upon the substance of the transaction in light of all the facts and circumstances.'" *Kimmich v. C.I.R.*, (1999) TC Memo. 1999-349, 1999 WL 959618, *6 (U.S. Tax Ct.)(quoting *Levien v. C.I.R.*, 103 T.C. 120, 128-29 (U.S. Tax Ct. 1994)).  In this matter,

---

> that the amounts due thereunder will be fully paid to the taxpayer. The possibility that the party making the guarantee to the taxpayer, or that a partnership which agrees to repurchase a partner's interest at an agreed price, will fail to carry out the agreement (because of factors such as insolvency or other financial difficulty) is not to be material unless and until the time when the taxpayer becomes unconditionally entitled to payment and, at that time, demonstrates that he cannot recover under the agreement.

S. REP. 94-938, 49, 1976 U.S.C.C.A.N. 3438, 3484-85, 4029, n. 364 (footnotes omitted).

In *American Principals*, the Ninth Circuit, citing solely to footnote 364, *supra*, finds that portion of the legislative history "shows that Congress intended to exclude the possibility that financial difficulty would prevent a guarantor from reimbursing a taxpayer for a loss from the subsection 465(b)(4) calculus," which, in turn, is evidence that the "worst-case scenario" is improper when determining whether a taxpayer has engaged in a loss-limiting arrangement. *American Principals*, 904 F.2d at 482. The Sixth Circuit however, relying upon all of the legislative history quoted above (save the first paragraph), disagreed with the Ninth Circuit, finding the legislative history indicates:

> [A] loss-limiting arrangement within the meaning of § 465(b)(4) is a *collateral agreement* protecting a taxpayer from loss *after the losses have occurred*, either by excusing him from his obligation to make good on losses or by compensating him for losses he has sustained.  Once the taxpayer has entered into such an arrangement, it is improper to inquire into the solvency of the insurer or guarantor in determining whether the taxpayer's investment is "at risk."  This is the significance of the passage above quoted by the [*American Principals*] majority from the legislative history of § 465(b)(4). That passage states that the solvency of a guarantor or insurer is irrelevant in determining whether a taxpayer's capital is at risk. The [*American Principals*] majority . . . ha[s] interpreted the passage by reading it as if it referred to the insolvency of any party to an investment transaction.  We think this incorrect.  In the main, the passage speaks of collateral agreements.

*Emershaw*, 949 F.2d at 849 (emphasis in original; citations omitted).

Relying solely upon the language of the statute and the cited legislative history, this Court tends to agree with the interpretation of the Sixth Circuit.  However, for reasons that will be discussed, this Court need not adopt either test, as it finds the result is the same regardless of the test employed.

although the government urges this Court to employ the economic realities test, it argues Moreno was not at risk under either test. [Doc. 28, p. 22] Contrarily, while plaintiff urges the Court to use the payor of last resort test, he asserts he was at risk under either test. [Doc. 30-2, pp. 2, 6]

As previously noted, plaintiff argues he was "at risk for the Aerodynamic activity of leasing the Aircraft, as Michel Moreno personally guaranteed the repayment of the loan from GE." [Doc. 21-2, p.11] "If the loan defaulted and the sale of the Aircraft was not sufficient to pay off the indebtedness, GE could pursue Mr. Moreno, Dynamic or both." [Id. at 13] Conversely, the government argues Moreno was not "at risk" with respect to his personal guaranty of the Aerodynamic loan, because Moreno engaged in a loss-limiting arrangement which effectively removed any realistic possibility that he would suffer an economic loss in the event Aerodynamic defaulted on its loan. [Doc. 28, p.10]

The Court agrees with the parties that in this matter, whether the economic realities or the payor of last resort test is employed, the result is the same. The Court further finds, pursuant to either test, plaintiff was "at risk" with respect to the Aerodynamic loan. Before delving into the specific arguments of the government however, the Court must note in every case cited by the government in support of its position that "the substance and economic realities of the transaction. . . effectively insulated Moreno from any realistic possibility of suffering an economic loss in connection with the GE loan," an important factor (and indeed, often the determinative factor) was the involvement of a complicated web of circular sale/leaseback transactions. Such an arrangement does not exist in this matter.[7] As noted in *Nicholson v. C.I.R.*, "[T]he determinative factor in these cases was that the

---

[7]The cited cases addressing circular sale-leaseback situations typically involve the following entities and relationships:

parties, through the use of nonrecourse financing and lease assignments, were able to create a *circular* web of offsetting liabilities, thereby effectively removing risk from the taxpayer claiming the deduction." 60 F.3d 1020, 1029 (3rd Cir. 1995)(Alito, J.)(emphasis in original).[8] Additionally, in many of the cited cases (*see e.g.*, *Moser*, 914 F.2d 1040; *Young*, 926 F.2d 1083; and *American Principals Leasing Corp.*, 904 F.2d 477), the investor's personal liability does not run through to an independent third-party lender, but rather, to the "Investment Creator," leading those courts to find the taxpayers were protected against loss. *See e.g.* Thomas A. Pliskin, *How Circular Transactions and Certain Interests of Lenders Affect Amounts of Risk*, 12 J.Partnership Tax, 54, 63 (1995). Such circumstances do not exist in this matter.

---

1. A seller-lessee who sells equipment to another entity (conduit purchaser)
2. The conduit purchaser takes a note in return
3. The conduit purchaser, at the same time, sells the equipment for a note to an investor (usually a partnership)
4. The investor who simultaneously leases the equipment back to the seller-lessee
5. Installment payments on both notes and leases that are equal and therefore offsetting

Thomas A. Pliskin, *At Risk Determinations In Circular Leasing Transactions*, CORPORATE BUSINESS TAXATION MONTHLY, August 2002, at 1.

[8] *See also Martuccio v. C.I.R.*:

> In the majority of circuits that have addressed the issue, the circular offsetting structure of payments in a three-party sale-leaseback transaction . . . would be sufficient to trigger the § 465(b)(4) exception from at-risk treatment for notes that will be paid through the circle of payments. . . . Those courts hold that the matching obligations of the parties to a three-party sale-leaseback transaction effectively immunize the taxpayer in petitioner's position from economic loss, and therefore the taxpayer is protected by a loss-limiting arrangement within the meaning of § 465(b)(4), notwithstanding the possibility that one of the parties might become insolvent and thereby upset the circular flow of payments.

*Martuccio*, 30 F.3d 743, 748 (6th Cir. 1994).

Page 12 of 33

According to the United States Tax court, "We scrutinize the economic reality of leasing activities by focusing in particular upon: The relationships between the parties; whether the underlying debt is nonrecourse; the presence of offsetting payments and bookkeeping entries; the circularity of the transaction; and the presence of any payment guarantees or indemnities." *Kimmich v. C.I.R.* L 959618, 5 -6 (U.S.Tax Ct.,1999). Here, the underlying debt is recourse, there are no offsetting payments and bookkeeping entries, no "circularity of the transactions," and there are no payment guaranties or applicable indemnity provisions. Rather, the only factor worth discussion is the relationship between the parties. Plaintiff was the sole owner of Aerodynamic (the borrower), and plaintiff owned 98% of Dynamic's parent company. However, no case has found this single factor removes "at risk" status.

Simply put, in this matter, the failure of Aerodynamic to meet the terms of its loan agreement would trigger a demand for payment by GE against Dynamic and/or Moreno. The government has alerted this Court to no arrangement that excuses performance under the note or protects against loss if the note payments are not made. Nevertheless, the Court will address the specific arguments asserted by the government. The government argues as follows:

**A.     In the event of default, Moreno did not have sufficient liquidity to repay the GE loan.**

The government argues GE's internal loan documents show from the time GE made the loan in September 2005 until the end of December 2005, "Moreno's financial statements show that he did not have sufficient liquidity to pay the GE Loan if Aerodynamic had defaulted on the loan." [Doc. 22-1, pp. 9-10] The government asserts "[a]lthough Moreno's financial statements show that he had a net worth of approximately $27 million in September 2005, the bulk of his assets consisted

Page 13 of 33

of non-marketable securities, retirement savings, and a $500,000 deposit/downpayment on the aircraft that Dynamic Industries paid." [Id. at 10] According to the government, once the foregoing items are excluded, Moreno's "adjusted net worth as of September 2005 totaled $11,537."[9] [Id.] The government additionally argues "Moreno's inter-company debts provide further support of his poor liquidity position at the end of 2005." [Doc. 22-1, p. 10] According to the government, "[i]n September 2005, Moreno owed approximately $2.3 million to his affiliated companies"; by the end of 2005, Moreno owed his affiliated companies "at least 3.5 million." [Id.] The government points out on December 27, 2005, Moreno Energy, Inc. authorized payment of a $4.8 million year-end bonus to Moreno, which Moreno Energy, Inc. applied in payment of the $3.5 million Moreno owed his affiliated companies.[10] [Id. at 11] The government additionally notes in 2005, Moreno personally guaranteed a $3 million line of credit on behalf of his company dii, LLC, and as of December 31, 2005, approximately $500,000 had been borrowed on that line of credit. [Id.]

According to plaintiff, "Defendant's argument ignores the economic reality that Moreno's personal financial statement referenced by the defendant reflected a net worth at the time of approximately 27 million dollars and that within fifteen (15) months of the close of 2005 the plaintiffs sold a 51% interest in Moreno Energy, Inc. and its affiliates for an amount in excess of 150

---

[9]The exhibit to which the government cites this Court in support of its position that Moreno's "adjusted net worth as of September 2005 totaled $11,537" does not support its argument. First, that exhibit states it is a Statement of Moreno's Financial Condition as of December 31, *2004*. [Doc. 24-2, pp. 144, 145] Additionally, the exhibit lists Moreno's net worth as over $30 million (not $27 million). However, even accepting the government's numbers, Moreno's "adjusted net worth," according to the cited documents, would be over $21 million, not "11,537" ($27,000,000 (net worth) - $5,104,647 (non-marketable securities) - $142,318 (retirement savings) - $500,000 (Dynamic downpayment) = $21,253,035). Further, the government has omitted any discussion of Moreno's $1,688,888 equity in his real estate holdings, the significant cash value of his life insurance policies, or his "cash on hand." [Id.]

[10]Presumably, the remaining $1.3 million was distributed to Moreno.

million dollars." [Doc. 30-2, pp. 7-8] Accordingly, "Moreno did indeed have the personal resources and independent means to cover his guaranty of the GE loan if Aerodynamic defaulted on the loan." [Id. at 8] Plaintiff further asserts, "The marketability of Moreno's closely held businesses in December of 2005 and Moreno's liquidity are disputed issues of fact." [Doc. 29, p.6]   Plaintiff argues the government has cited no legal authority "that a guarantor must have unencumbered cash or marketable resources to satisfy a claim under a guaranty to be at risk." [Doc. 30-2, p. 7] Plaintiff notes had he been called upon to satisfy Aerodynamic's obligation, he could have borrowed the funds from a third-party lender "or from an entity owned by the plaintiffs . . . ." [Id.]

First, the Court agrees with plaintiff that his liquidity in 2005 is a question of fact[11]; however, the Court finds the foregoing is not a *material* question of fact, as the government has cited no legal authority "that a guarantor must have unencumbered cash or marketable resources to satisfy a claim under a guaranty to be at risk." Even assuming *arguendo* the government's position is factually correct, plaintiff would still be "at risk" of losing the value he committed to the investment - namely, his financial credit, which he encumbered by personally guaranteeing the Aerodynamic loan.  26 U.S.C. § 465(b)(1) and (2) (a taxpayer is at risk for amounts borrowed with respect to the activity to the extent taxpayer is personally liable); *see also Emershaw*, 949 F.2d at 847; *Hubert Enterprises, Inc. v. C.I.R.*, T.C. Memo. 2008-46, 2008 WL 540177 (U.S. Tax Ct.).  Regardless, the government has cited no legal authority, nor persuasively argued, that the Internal Revenue Code envisions "at risk" treatment solely for those taxpayers who are "personally liable" for "amounts borrowed," *provided the taxpayer has available at all times cash-on-hand in an amount sufficient to pay the*

---

[11]Particularly given the government's assertion of Moreno's net worth, compared to the evidence it has provided in support of its assertion of fact.  *See* note 9, *supra*.

*obligation guaranteed, in the event of a default by the primary obligor.*  Such a requirement would

be highly impractical, if not financially absurd.

**B.    GE relied upon Dynamic Industries, and not Moreno, as security for the Aerodynamic loan.**

In support of this argument, the government asserts the following: in approving the loan to

Aerodynamic, "GE Capital performed an extensive review and analysis of the financial condition

of Dynamic Industries and Moreno, and concluded that 'Dynamic [Industries] . . . is where most of

the assets and income reside.'"[12]; GE's internal documents show it was relying on the strong

financial position of Dynamic in approving the loan; in GE's internal documents, it "made no

mention of Moreno's guarantee or otherwise discuss him as a possible source to repay the GE loan

in the event that Aerodynamic defaulted on the loan"; the internal documents state "[GE]'s primary

exit strategy is Dynamic's balance sheet strength, positive cash flow, and revolver availability.

Secondary exit strategy is the sale of a new aircraft with minimal exposure throughout initial 72

months." [Doc. 22-1 at 11-12]

---

[12]To provide some context, the GE document referenced by the government reads as follows:

> Our Guarantors are Dynamic Industries, Inc. and Mr. Mike Moreno's PG.  Dynamic is a
> Subsidiary of the holding company Moreno Energy Services, Inc.  This is where most of
> the assets and income reside.  Subsidiary of Moreno Energy Services Inc, Lafayette, LA
> started 1998 which operates as offshore oil and drilling operations.  Parent company
> owns 100% of capital stock.  Parent company has three other subsidiary(ies).
> Intercompany relations: consists of certain officers.  No loans, endorsements or
> guarantees were reported.  As noted, this company is a subsidiary of Moreno Energy
> Services Inc., Engaged in offshore oil and gas fabrication (100%).

[Doc. 24-2, p. 310, Ex. 58] From the foregoing, it is not clear to this Court whether GE Capital is stating
"most of the assets and income reside" with Dynamic rather than Michel Moreno, or "most of the assets
and income reside" with Dynamic rather than Moreno Energy, Inc.

According to plaintiff, "GE's internal analysis of the financial strengths of the various guarantors is not really relevant to the issue," in light of the fact GE required, and was given, a personal guaranty by Moreno. [Doc. 29, p.6] Plaintiff further argues defendant's position that GE would have pursued Dynamic rather than Moreno in the event of Aerodynamic's default "fails to take into consideration that Moreno Energy, Inc. and Dynamic had significant debt to third-party lenders and that all of Dynamic's assets were pledged as security for its loans from its third-party lenders."[13] [Doc. 30-2, p. 7]

Again, the Court finds this is a question of fact, but not a question of *material* fact. Again, the government has cited no legal authority in support of its position that where a lender's internal loan documents purportedly show the lender is relying upon the financial strength of one surety over another surety, the latter surety is no longer to be given "at risk" treatment under section 465, because the foregoing scenario constitutes protection from loss under either the payor of last resort test or the economic reality test.

**C.    In the event of default, Moreno would have Dynamic Industries pay the loan, ensuring plaintiff would never be required to use his personal assets.**

According to the government, "the undisputed facts also show that Moreno, as controlling shareholder of Moreno Energy, had the requisite ability to ensure that Dynamic Industries (and not Moreno) paid any loss that may result upon default of the loan by Aerodynamic, and that his personal assets would be protected from such loss." [Doc. 22-1 at 12; *see also* Doc. 28, p. 16] According to plaintiff, "if Dynamic funds were used to repay the GE loan it would create a debt from Moreno to

---

[13]Plaintiff further asserts "GE had no security for the Dynamic corporate guaranty and would have been an unsecured creditor for any claim made against Dynamic on the corporate guaranty." [Doc. 30-2, p. 7]

Dynamic and/or its parent," and that "[i]n such event Moreno would be the person that would suffer the ultimate economic loss," either by paying Aerodynamic's obligation through his personal finances, or by diminution of the value of his companies. [Doc. 29, p.6]  Again, the Court finds this is a question of fact, but it is not material.  Both Dynamic and Moreno were sureties on the Aerodynamic loan.  If Aerodynamic were to default on the loan, the bank could call upon Dynamic, Moreno, or both to satisfy the obligation.  Accordingly, the government's speculative assertion, which necessarily requires a resolution of disputed facts, is insufficient to show Moreno engaged in a prohibited loss-limiting arrangement.

> **D.    Moreno was protected against loss through an indemnity provision provided in his employment agreement with Moreno Energy, Inc.**

The government argues, "the MES Agreement ensured that Moreno would be indemnified from any loss that may arise if Aerodynamic defaulted on the loan." [Doc. 22-1 at pp. 12-13]  The "MES Agreement" to which the government refers is a document entitled, "Personal Service and Employment Agreement," entered into by Moreno and Moreno Energy Services, Inc.  Specifically, the government cites this Court to the indemnity provision contained within the Personal Service and Employment Agreement [Id. at 13], which reads as follows:

> 9.    **Indemnification: Liability Insurance.**  The Company shall indemnify and hold Moreno (or his legal representative) harmless to the full extent permitted by applicable law for all legal expenses and all liabilities, losses, judgments, fines, expenses, and amounts paid in settlement in connection with any proceeding involving him (including any action by or in the right of the Company) by reason of his being or having been a director, officer, employee, consultant, or agent of the Company or any of its subsidiaries, affiliates, or any other enterprise *if he is serving or has served at the request of the Company*.  In addition, the Company shall cause any such subsidiary, affiliate, or enterprise also to so indemnify and hold Moreno harmless to the full extent permitted by applicable law.  The foregoing shall not be deemed to limit any rights of Moreno pursuant to applicable indemnification provisions of the Company's Articles of Incorporation or By-Laws or otherwise. . .

[Doc. 24-5, p. 18, Ex. 133 (italics added; other emphasis in original)]  The government argues because Dynamic and Aerodynamic are, respectively, a subsidiary and an affiliate of Moreno Energy Services, Inc., "the MES indemnification provisions effectively protect Moreno from suffering any realistic possibility of a loss in connection with the GE loan," because it protects Moreno "for acts he took on their behalf."  [Doc. 35, pp. 3-4]

Plaintiff responds, "A simple reading of the [indemnity] provision reveals that it does not afford Moreno any protection against a loss with respect to his guaranty of the GE loan." [Doc. 29, p. 8] Plaintiff contends the indemnity provision "is a standard indemnification agreement which offers protection to officers and directors of corporations in connection with the performance of their duties as directors, officers, employees, consultants or agents of the corporation or the corporation's subsidiaries, affiliates or other enterprises if serving in such capacity at the request of the corporation." [Id.] Plaintiff argues his personal guaranty to GE was not made in his capacity as "a director, officer, employee, consultant, or agent of Moreno Energy Services, Inc. or any of its subsidiaries, affiliates or any other enterprises where he was serving at the request of Moreno Energy Services, Inc.," but rather was provided at the request of GE in plaintiff's capacity "as the sole member of Aerodynamic, LLC." Accordingly, plaintiff contends the referenced indemnity provision does not provide plaintiff with a "cause of action against Moreno Energy Services, Inc. for indemnity to recover any amounts he might be called upon to pay under the guaranty of the GE loan to Aerodynamic under the MES Agreement." [Id. at 8-9]

The Court agrees the government has not shown the indemnity provision contained in Moreno's employment contract with Moreno Energy Services, Inc. is sufficiently broad in scope, such that it applies to Moreno's *personal* guaranty of the Aerodynamic loan.  No evidence has been

provided to this Court that the personal guaranty was executed in Moreno's capacity as a director, employee, agent, etc. of Moreno Energy Services, Inc. or its subsidiaries or affiliates, nor has any evidence been presented that Moreno executed the *personal* guaranty because he was serving in such a capacity "at the request of" Moreno Energy Services, Inc.

**E.      In the event of default, if Dynamic were to pay the loan, it would be unable to recover any of its payment from Moreno.**

In plaintiff's opening brief, he argues he is entitled to at risk treatment, because in the event either he or Dynamic satisfied the obligation on behalf of Aerodynamic, the paying surety would have a right of contribution against the non-paying surety for fifty percent of the amount paid, pursuant to La. Civ. Code arts. 3055 and 3056.[14] [Doc. 21-2 at p. 13] Plaintiff further contends were Dynamic to pay the obligation, Dynamic would also have a right of reimbursement from plaintiff "for the remainder of the amount it paid as such amount would be accounted for and set up on the books of Dynamic or its parent [Moreno Energy Services, Inc.] as due from stockholder since the

---

[14]Louisiana Civil Code article 3055 provides:

Co-sureties are those who are sureties for the same obligation of the same obligor. They are presumed to share the burden of the principal obligation in proportion to their number unless the parties agreed otherwise or contemplated that he who bound himself first would bear the entire burden of the obligation regardless of others who thereafter bind themselves independently of and in reliance upon the obligation of the former.

Louisiana Civil Code article 3056 provides,

A surety who pays the creditor may proceed directly or by way of subrogation to recover from his co-sureties the share of the principal obligation each is to bear. If a co-surety becomes insolvent, his share is to be borne by those who would have borne it in his absence.

payment would be for the benefit of Aerodynamic, one of Mr. Moreno's wholly owned entities."[15] [Id.] Alternatively, plaintiff argues Dynamic would have a claim against him for unjust enrichment pursuant to La. Civ. Code art. 2298 for "the amount it paid in excess of the amount that would be recoverable under its right of contribution as such a payment would not benefit Dynamic." According to plaintiff, "Therefore Mr. Moreno would have been ultimately responsible for the repayment of amounts paid by Dynamic to Dynamic or its parent." [Id. at 14]

While the government acknowledges Dynamic "might have a right of contribution against Moreno, as a co-surety" for half of any amount Dynamic paid pursuant to La. Civ. Code arts. 3055 and 3056, the government again argues "any recovery realized therefrom would be offset in full by the indemnification claims that Moreno could assert pursuant to the provisions of the MES agreement." [Doc. 28, pp. 18-19]  With regard to plaintiff's argument Dynamic would have a right of reimbursement against him for the remaining fifty percent (either contractually or pursuant to a theory of unjust enrichment), the government responds, "[i]t is doubtful that Dynamic Industries would have a valid reimbursement claim against Moreno because its execution of the corporate guaranty was for its benefit [i.e. use of the aircraft], as much as it was for Moreno's benefit," but "even if Dynamic Industries had a valid reimbursement claim, its recovery on that claim would be canceled by the indemnification claims that Moreno would assert pursuant to the MES indemnification provisions." [Id. at 19-20] The government further argues plaintiff would have no cause of action for unjust enrichment, because such a remedy "is not available if the law provides

---

[15]Plaintiff cites no contractual or other legal basis in support of his argument that Dynamic would have a right of reimbursement against him "as such amount would be accounted for and set up on the books of Dynamic or its parent as due from stockholder since the payment would be for the benefit of Aerodynamic, one of Mr. Moreno's wholly owned entities."  Presumably, this is an internal accounting practice of Moreno and his various companies.

another remedy," and here, plaintiff argues "Dynamic Industries had various contractual rights to pursue recovery from Moreno (e.g., right of contribution, and right of reimbursement). . . . ." [Doc. 28, p.10]

Again, the Court finds the indemnity provision is inapplicable to the facts at hand, and thus does not constitute a prohibited loss-limiting arrangement.  With respect to rights of contribution and reimbursement, where a member of a limited liability company guarantees a liability of the limited liability company, he or she is at risk, except to the extent he or she has a right of contribution or reimbursement from the other guarantors.  *See e.g.* IRS Field Service Advisory 2000-25-018 (June 23, 2000), 2000 WL 33116072 (each member of a limited liability company "who has guaranteed a liability of the limited liability company is at-risk, except to the extent the member has a right of reimbursement against the remaining members"); IRS Chief Counsel Advisory 20130828 (February 22, 2013), 2013 WL 653295 ("an LLC member is at risk with respect to LLC debt guaranteed by the member (where the LLC is treated as either a partnership or a disregarded entity for federal tax purposes), but only to the extent that the member has no right of contribution or reimbursement from the other guarantors. . . "; taxpayer is not at risk "for those amounts" for which he has a right of contribution against co-sureties); Susan Kalinka, *Limited Liability Companies and Partnerships: A Guide to Business and Tax Planning*, 9A LACIVL § 6.7 (3d ed.) (2012)(a member of an LLC who guarantees an obligation of the LLC will assume personal liability for the LLC's obligation, and that member should be entitled to include in his or her at risk amount the portion of the guaranteed liability for which the member may not seek reimbursement); S. Rep. 94-938, 49, 1976 U.S.C.C.A.N. 3438, 3485 ("a taxpayer's capital is not 'at risk' in the business . . . to the extent he is protected against economic loss of all or part of such capital by reason of an . . . arrangement for

compensation or reimbursement to him of any loss which he may suffer"). Here, all parties acknowledge that if either Dynamic or Moreno were to pay Aerodynamic's obligation, the paying entity would have right of contribution against the other for half the amount it paid, pursuant to La. Civ. Code arts. 3055 and 3056. Under such circumstances, the IRS has determined a guarantor is at risk for fifty percent of the amount guaranteed.

With regard to plaintiff's assertion Dynamic would have a right of reimbursement or a claim of unjust enrichment against Moreno for the remaining fifty percent it paid on behalf of Aerodynamic, plaintiff has failed to carry his burden of proof, both legally and factually. First, plaintiff has provided this Court with nothing other than argument that "Dynamic would also have the right to proceed against Moreno for the remainder of the amount it paid as such amount would be accounted for and set up on the books of Dynamic or its parent [Moreno Energy Services, Inc.] as due from stockholder since the payment would be for the benefit of Aerodynamic, one of Mr. Moreno's wholly owned entities."[16] Likewise, plaintiff has only superficially addressed a claim of unjust enrichment. "[T]he remedy of unjust enrichment is subsidiary in nature, and "shall not be available if the law provides another remedy." *Walters v. MedSouth Record Management, LLC*, 38 So.3d 243, 244 (La. 2010). Here, although he has failed to carry his burden for purposes of this motion, plaintiff asserts Dynamic would have a right of reimbursement as the monies Dynamic paid would be accounted for as "due from stockholder . . . [and] would be for the benefit of Aerodynamic. . . " Whether plaintiff is asserting Dynamic would be entitled to reimbursement pursuant to a contractual right, a right of subrogation, or upon some other basis is not stated, but nevertheless,

---

[16]Plaintiff does not state from where such a "right" would aries - *i.e.*, whether by contract, subrogation, the revised statutes addressing limited liability companies, etc.

plaintiff asserts "the law provides another remedy." Furthermore, to survive a claim for unjust enrichment, the enrichment must be "without cause." La. Civ. Code art. 2298. "The term 'without cause' is used in this context to exclude cases in which the enrichment results from a valid juridical act or the law." *Id.* Here, any enrichment to plaintiff caused by Dynamic's payment of Aerodynamic's obligation would result from the corporate guaranty Dynamic provided GE - in other words, it would result from contractual law. Most importantly however, plaintiff has cited no legal authority supporting his positions regarding a right of reimbursement and a claim of unjust enrichment, and the Court finds such claims to be too speculative to find plaintiff would be at risk for the entire amount guaranteed.[17]  Accordingly, in this matter, the Court finds Moreno was at risk with respect to the Aerodynamic loan, except to the extent he had a right of contribution against Dynamic Industries (*i.e.*, Moreno was at risk for fifty percent of the amount guaranteed).

II.     **Whether the leasing of Aerodynamic's aircraft constituted a "rental activity," as defined by the Treasury Regulations, such that it was subject to the "passive activity" loss rules.**

The issue for decision is whether the losses plaintiff incurred in his aircraft leasing business are subject to the passive activity loss rules set forth in 26 U.S.C. § 469. It is undisputed Aerodynamic entered into an agreement (entitled "Non-Exclusive Aircraft Lease Agreement") with six entities in 2005 to whom it later tendered the use of its aircraft, and all signatories to those agreements acknowledged Louisiana law would govern the agreement. For the reasons that follow,

---

[17]However, as previously noted, in the future, should Dynamic satisfy Aerodynamic's obligation, and thereafter should Dynamic successfully pursue claims for reimbursement and/or unjust enrichment against plaintiff for the remaining fifty percent over and above Dynamic's right of contribution, at that time plaintiff may carry forward and deduct those losses. 26 U.S.C. § 465(a)(2) (Losses disallowed by this provision may be carried forward and deducted as losses in succeeding taxable years if the at risk rules become satisfied.)

the Court holds the losses incurred by plaintiff are not subject to the passive activity loss rules.

Section 469 of the Internal Revenue Code generally disallows passive activity losses incurred by individual taxpayers for the taxable year.[18]   26 U.S.C. § 469(d)(1). A passive activity loss is the amount by which the aggregate losses from all passive activities for the taxable year exceed the aggregate income from all passive activities for such year. *Id.*   Generally, a passive activity is a trade or business in which a taxpayer does not materially participate. *Id.* at 469(c)(1). "[T]he term 'passive activity' includes any rental activity," regardless of whether the taxpayer materially participates in that activity. *Id.* at 469(c)(2), (4).[19]   The Treasury Regulations define "rental activity" as follows:

> [A]n activity is a rental activity for a taxable year if–
>
>> (A) During such taxable year, tangible property held in connection with the activity is used by customers or held for use by customers; and
>>
>> (B) The gross income attributable to the conduct of the activity during such taxable year represents . . . amounts paid or to be paid principally for the use of such tangible property (without regard to whether the use of the property by customers is pursuant to a lease or pursuant to a service contract or other arrangement that is not denominated a lease).

26 C.F.R. § 1.469-1T(e)(3)(i). However, as relevant herein, "an activity involving the use of tangible property is not a rental activity for a taxable year if for such taxable year– (A) The average period of customer use for such property is seven days or less. . . ." *Id.* at § (e)(3)(ii)(A).

The "average period of customer use" is determined by dividing: (1) the aggregate number of days in all periods of customer use for the property (taking into account only periods that end

---

[18]Passive losses which exceed the related passive income can be carried forward indefinitely for use in subsequent years.  26 U.S.C. § 469(b); Treas. Reg. § 1.469-1T.

[19]The Code defines "rental activity" as "any activity where payments are principally for the use of tangible property." *Id.* at 469(j)(8).

during the taxable year or include the last day of the taxable year); by (2) the number of periods of

customer use. 26 C.F.R. § 1.469-1(e)(3)(iii)(C). The regulations define "period of customer use,"

in pertinent part, as follows:

> Each period during which a customer has a continuous or recurring right to use an
> item of property held in connection with the activity (without regard to whether the
> customer uses the property for the entire period or whether the right to use the
> property is pursuant to a single agreement or to renewals thereof) is treated for
> purposes of this paragraph (e)(3)(iii) as a separate period of customer use.

26 C.F.R. § 1.469-1(e)(3)(iii)(D).

At its core, the disagreement in this matter between the parties stems from the position each

takes as to how to calculate the number of "periods of customer use." More specifically, the parties

disagree as to that period of time "during which a customer ha[d] a continuous or recurring right to

use" the aircraft. Plaintiff contends under the "Non-Exclusive Aircraft Leasing Agreement," each

"period of customer use" is determined by each distinct period of time a lessee was in actual

possession of the aircraft[20]; the government contends once the "Non-Exclusive Aircraft Leasing

Agreement" was signed, a contract of lease was perfected, and thereafter, the lessee had a continuous

and recurring right to use the aircraft, unless and until the contract of lease was terminated.[21]

According to plaintiff's method of calculation, there were thirty-five periods of customer use in

2005; according to the government's method of calculation, there were six periods of customer use

---

[20]That is to say, if a lessee used the aircraft for one day, that would constitute one period of
customer use; if a lessee used the aircraft over a three day period, that also would constitute one period of
customer use. However, if a lessee used the aircraft and returned it to the owner the same day, and then
used the aircraft again a week later, that would constitute two periods of customer use.

[21]In other words, once the agreement was signed (and assuming it was not terminated prior to the
end of the taxable year), every day thereafter counted as one period of customer use, regardless of
whether or not the lessee ever used the Aircraft at all.

in 2005 (i.e. one period of customer use for each of the six customers with whom Aerodynamic contracted).

Plaintiff supports his argument as follows:

The "Non-Exclusive Aircraft Lease Agreement" constitutes a contract of lease without a "definitive term."[22] [Doc. 21-2, p. 17] The agreement does not "provide the lessee with a continuous or recurring right to use the Aircraft," because: (1) the agreement "could be terminated at the will of the parties at any time the Aircraft was in the possession of the owner," and (2) "each use of the Aircraft by the lessee was subject to the owner's approval and . . . the owner could approve or deny any flight scheduling request at the owner's discretion." [Doc. 21-2, pp. 17, 18-19] Plaintiff argues the lease agreements in this matter are similar to master service contracts, in that the lease agreements provide "the terms of the lease if the lessee rents the Aircraft and schedules a flight." [Id.; *see also* Doc. 29, p. 12 ("The lease agreements don't grant any of the lessees' the right to use the aircraft, the lease agreements only provide the terms of the lease when a lessee uses the aircraft.")] "Aerodynamic is not obligated to allow the lessee to use the Aircraft upon request nor does the lessee agree to use the Aircraft for any specified time or number of flight hours." [Id. at 17] Therefore, "[e]ach flight by a lessee was a separate rental or lease." [Id. at 19] In light of the foregoing, plaintiff contends the aggregate number of days in all periods of customer use in 2005 was 44, and there were 35 periods of customer use. Thus, the average period of customer use of the aircraft for 2005 was 1.25714 days. [Doc. 21-2, p. 18] Because the average period of customer use for the aircraft in 2005 was less than seven days, plaintiff is not subject to the passive activity loss

---

[22]Using the terminology of the Louisiana Civil Code, plaintiff argues the agreement constitutes a lease with an "indeterminate" term. La. Civ. Code art. 2628.

rules, as Aerodynamic's leasing activity is not a "rental activity," as defined by the Treasury Regulations.  Implicit in plaintiff's argument is that the only time a lessee had "a continuous or recurring right" to use the aircraft was when that lessee was in actual possession of the Aircraft.

The government supports its position as follows:

The "Non-Exclusive Aircraft Lease Agreement" constitutes a contract of lease, with "a definite term – the life of the aircraft – with a reservation of right to terminate."[23]  [Doc. 28, pp. 25-26; *see also id.* at 28] Because none of the agreements were terminated in 2005, each lessee had a continuous and recurring right to use the Aircraft from the time each agreement was entered into, through the end of taxable year 2005.  Therefore, the aggregate number of days in all periods of customer use was 508[24], and there were six periods of customer use. [Doc. 22-1, pp. 15-16] Accordingly, the average period of customer use of the aircraft for 2005 was 84.67 days. [Id. at 16] The government concludes, "Because the average period of customer use of the aircraft for 2005 exceeds seven days, Aerodynamic's rental activity does not qualify for exception as a nonrental activity under 26 C.F.R. § 1.469-1T(e)(3)(ii)(A)." [Id.] Thus, the government's argument is that once the agreements were signed, each of the six lessees had a concurrent, continuous and recurring right

---

[23]Using the terminology employed by the Louisiana Civil Code, the government argues the agreement constitutes a lease with a "fixed" term. La. Civ. Code art. 2628 (The term of a lease "is fixed when the parties agree that the lease will terminate at a designated date or upon the occurrence of a designated event"); *see also id.* at comment (d) ("A term is fixed when, pursuant to the agreement of the parties, its terminal point is marked in advance by a particular date on the calendar or by the occurrence of a future event that is bound to occur, albeit on a date not yet known (e.g., the death of the lessee).")

[24]Five of the six lessees entered into the agreement on September 30, 2005.  Ninety-three days elapsed from September 30, 2005 until December 31, 2005.  Thus, the aggregate number of days for those five lessees is 465.  The sixth lessee entered into the agreement on November 18, 2005, which, according to the government, granted that lessee with the continuous and recurring right to use the aircraft for 43 days.  Therefore, the government argues the total aggregate number of days in all periods of customer use for the Aircraft is 508 days. [Doc. 22-1, p. 15]

to use the aircraft for the duration of the year, and therefore, there are six "periods of customer use" for taxable year 2005. [*See e.g.* Doc. 28, pp. 23, 26, 28, 29-30 (citing 26 C.F.R. § 1.469-1(e)(3)(iii)(D))]

In this matter, the Court finds the agreements provide, in pertinent part, as follows:

- "[T]he Aircraft is leased to Lessee on a non-exclusive basis, and [] the Aircraft will be subject to use by Owner, and may also be subject to additional non-exclusive leases to other parties during the Term" [*see e.g.* Doc. 21-3, p. 89; *see also id.* at 87]

- The "'**Lease Period**' . . . shall commence with delivery and conclude with the return of the Aircraft" [Id. at 88 (emphasis in original)]

- The agreement "may be terminated at the will of the parties at any time the Aircraft is in the possession of the Owner" [Id. at 89]

- "Each use of the Aircraft by Lessee shall be subject to Owner's approval" [Id.]

- Lessees are to submit their flight scheduling requests to the Owner "as far in advance as reasonably possible," and the "Owner may approve or deny any flight scheduling request in Owner's sole discretion" [Id.]

- The lessee is required to pay "rent in an amount equal to the Hourly Rent [set forth in an attachment to the contract] . . . for each Flight Hour of use of the Aircraft by Lessee." [Id.]

There are three elements required to create a contract of lease under Louisiana law: "the thing, the price, and *the consent*." *Acadiana Bank v. Foreman*, 352 So.2d 674, 678 (La. 1977)(emphasis added); *see also* La. Civ. Code art. 2628. Louisiana law also recognizes "contracts to lease," to wit, "[a] contract to enter into a lease at a future time is enforceable by either party if there was agreement as to the thing to be leased and the rent, *unless the parties understood that the contract would not be binding* until reduced to writing or *until its other terms were agreed upon*." La. Civ. Code art. 2670 (emphasis added). In this matter, the parties contemplated a suspensive condition would be fulfilled prior to the existence of a binding contract for lease - namely, the

potential lessee was required to submit a flight scheduling request for the owner's approval. [Doc. 21-3, p. 89, ¶ 3.2][25] Until the owner approved the flight scheduling request, there was no binding contract for lease, as there was no "consent" by the lessor. [Id.] Once the owner approved a flight scheduling request, the suspensive condition was fulfilled, and the "Non-Exclusive Aircraft Leasing Agreement" converted from a contract *to* lease into a binding and enforceable contract *of* lease. The lease commenced upon delivery of the aircraft to the lessee on the date requested (and approved) in the flight scheduling request, and "conclude[d] with the return of the Aircraft." [Doc. 21-3, p. 88 ("Lease Period")] Thereafter, an invoice was submitted to the lessee containing a calculation of the rent due.[26] [Doc. 24-4, -5, Ex. 107, 112, 116, 123, 130 and 131]

The term of the lease was indeterminate, in that it was dependent upon the will of the parties. La. Civ. Code art. 2678, *id.* at comment (e) ("A term is indeterminate if its terminal point is not fixed in advance but depends on the will of the parties subsequently expressed, such as a month-to-month lease or another periodical lease"); *see also Becker & Associates, Inc. v. Lou-Ark Equipment Rentals, Inc.*, 331 So.2d 474, 476 (La. 1976). Because no time for the duration of the lease was agreed upon by the parties, its duration is supplied by law. La. Civ. Code art. 2680. The aircraft is a moveable, with its rent being fixed by the hour. Therefore, as a matter of law, the duration of the lease is hour-by-hour. *Id.*[27] "A lease with an indeterminate term, including . . . a lease whose term has been

---

[25]La. Civ. Code art. 1767 ("A conditional obligation is one dependent on an uncertain event. If the obligation may not be enforced until the uncertain event occurs, the condition is suspensive.").

[26]The rent was determined by multiplying the hourly rate specified in the "Non-Exclusive Aircraft Leasing Agreement" by the number of "Flight Hour[s] of use." [Doc. 21-3, p. 89, ¶ 3.3]

[27]Where "the parties have not agreed on the duration of the term . . . [a] lease of . . . moveables shall be from day to day, unless the rent was fixed by longer or shorter periods, in which case the term shall be one such period, not to exceed one month." La. Civ. Code art. 2680.

established through Article 2680, terminates by notice to that effect given to the other party by the party desiring to terminate the lease. . . ." La. Civ. Code art. 2727. "In a lease whose term is measured by a period shorter than a week," notice of termination shall be given "at any time prior to the expiration of that period." La. Civ. Code art. 2728. The notice of termination may be written, oral, or by "*surrender of possession to the lessor*," at any time prior to the expiration of the time allowed for notice of termination. La. Civ. Code art. 2729 (emphasis added).[28]  In light of the foregoing, the Court finds there was no "continuous or recurring right" to use the aircraft from the date the parties entered into the "Non-Exclusive Aircraft Lease Agreement" until the end of taxable year 2005. All the "Non-Exclusive Aircraft Lease Agreement" provided, in and of itself, was a continuous and recurring right to request to lease the plane, as well as the terms that would govern any lease entered into in the future. Because the agreement clearly stated a potential lessee's request could be granted or denied in the owner's sole discretion, there was no "continuous or recurring right" to use the aircraft, except when the aircraft was in the actual possession of a lessee.[29] Accordingly, the Court finds a period of customer use under the facts of this case consisted of each distinct period of time a lessee had actual possession of the aircraft.[30]  When the aggregate number

---

[28]In other words, because the aircraft in this matter was leased by the hour, surrender of possession of the aircraft by the lessee to the owner constituted sufficient notice of termination of the lease under the Civil Code. Of course, in light of the parties' master agreement (i.e. the "Non-Exclusive Aircraft Leasing Agreement"), that party could thereafter submit a flight scheduling request, and upon approval by the Owner, a new contract of lease was perfected.

[29]Indeed, the government acknowledges "[a] lessee's request to rent the aircraft was denied on those occasions when another lessee had previously arranged to rent the aircraft." [Doc. 22-1, p. 8]

[30]The Court additionally notes the cases the government cites in support of its position that the contract in this matter provides each lessee with a continuous or recurring right to use the aircraft from the signing of the agreement through the end of taxable year 2005 are factually distinguishable. [Doc. 28, p. 24] For example, the government cites to *Kenville v. United States*, 1998 WL 1780673, *5, n. 7 (D.N.D.), stating that case "treat[s] the Spectrum Aviation *non-exclusive* lease from January 1 through

of days in all periods of customer use is divided by the number of periods of customer use, the "average period of customer use" is less than seven days.[31]  Accordingly, the Court finds the activity at issue does not constitute a "rental activity," as that term is defined in the Treasury Regulations, and therefore, the losses plaintiff incurred in his aircraft leasing business in the year 2005 are not subject to the passive activity loss rules set forth in 26 U.S.C. § 469.[32]

## Conclusion

In light of the foregoing, plaintiffs' motion for partial summary judgment [Doc. 21] is GRANTED IN PART and DENIED IN PART. The motion is granted to the extent plaintiffs seek a ruling they were at risk with regard to the leasing activity of Aerodynamic, LLC, however, the

---

April 1, 1991 as one period of customer use, and the American Check Transport a/k/s ACT/FL **non-exclusive** lease from May 13 through December 31, 1991 as one period of customer use."  First, what constitutes a period of customer use was not at issue in that case.  Second, it was not the court, but the plaintiff who treated each of those leases as a separate period of customer use.  Third, those leases did not overlap, and thus, plaintiff was not asserting, as the government does in this matter, that multiple lessees of the same property could have simultaneous "continuous or recurring" rights to use the same moveable property.  Finally, although not enough detail is provided in the opinion, it appears those leases were "non-exclusive" in the sense that the lessee could sublease the property; in this matter, the agreement uses the term "non-exclusive" to signify the owner could enter into aircraft leases with parties other than a particular signatory to the agreement.  In the other cases cited by the government, the owner of the property leased the property on a long-term basis to a lessee who then subleased the property on a short-term basis.  Under such a scenario, the owner of the property could not claim that the short-term subleases (to which the owner was not a party) excepted the transaction from treatment as a rental activity.  *See e.g. Hairston v. C.I.R.*, T.C. Memo 2000-386, 2000 WL 1862902; *White v. C.I.R.*, T.C. Summ.Op. 2004-139, 2004 WL 2284383.  Such is not the factual scenario before this Court.  Here, Aerodynamic did not enter into a long-term lease with one of the six entities, who then sub-leased the aircraft to the other five entities.

[31]While there are minor disagreements as to the specific days each lessee was in possession of the aircraft, using either parties' numbers, the average period of customer use is far less than seven days. [*See* Doc. 28-1, pp. 6-11]

[32]Because the Court finds, by virtue of 26 C.F.R. § 1.469-1T(e)(3)(ii)(A), plaintiff's aircraft leasing activity is not a rental activity and therefore does not constitute a passive activity, the Court need not address the government's arguments as to the inapplicability of other exceptions to the passive activity rules.

Court finds plaintiffs were at risk only with respect to fifty percent of the Aerodynamic loan. The motion is additionally granted to the extent plaintiffs' seek a ruling that the leasing activity of Aerodynamic, LLC in 2005 was not a rental activity for purposes of the passive activity loss rules. The government's motion for partial summary judgment [Doc. 22] is DENIED.

THUS DONE AND SIGNED in Lafayette, Louisiana, this _____19_____ day of May, 2014.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE